776 S.E.2d 115

SOUTH CAROLINA DEPARTMENT OF
SOCIAL SERVICES, Respondent,

v.

I'Tesha C. BRIGGS and Danny L. Johnson, Defendants,

Of whom I'Tesha C. Briggs is the Appellant.

In the interests of minor children under the age of 18.

Appellate Case No. 2014–002147.
No. 5339.

Court of Appeals of South Carolina.

Heard July 1, 2015.
Decided Aug. 3, 2015.

378

Benjamin Reynolds Elliott, of Stevens B. Elliott, Attorney at Law, of Columbia, for appellant.

Kathleen J. Hodges, of South Carolina Department of Social Services, of Walhalla, for respondent.

Angela L. Kohel and Samantha Monique Luck, both of Richland County CASA, of Columbia, for the Guardian ad Litem.

PER CURIAM.

In this appeal from a permanency planning order and a removal order, I'Tesha C. Briggs argues the family court erred in (1) changing the permanent plan from reunification to relative custody concurrent with termination of parental rights (TPR) and adoption, (2) allowing the Department of Social Services (DSS) to forego reasonable efforts at reunification, and (3) removing her infant child based on the alleged abuse and neglect of her three older children. We affirm in part, reverse in part, and remand for a new permanency planning hearing.

## I. Facts and Procedural History

On August 2, 2013, Briggs's older three children were placed in emergency protective custody due to allegations of physical abuse by Briggs.[1] After a contested merits hearing,[2] the family court determined Briggs physically abused the children and adopted a placement plan prepared by DSS pursuant to section 63–7–1680 of the South Carolina Code (Supp.2014). The placement plan required Briggs to complete a psychological evaluation, attend various forms of counseling, obtain and maintain stable housing and income, and complete a drug and alcohol assessment. The placement plan also set forth specific goals for behavioral changes and parenting skills. The placement plan stated DSS would "arrange or provide" the counseling and evaluation services. The family court ordered—in addition to the placement plan—a psychologist evaluate Briggs's oldest child, a counselor observe Briggs interact with the children, and a psychologist evaluate whether Briggs could parent the children considering their special needs.

---

1. The children were born in 2010, 2011, and 2012.

2. Whenever DSS files a removal petition, the family court must hold a hearing on the merits of the removal petition to determine if the allegations in the removal petition are supported by a preponderance of the evidence. S.C.Code Ann. § 63–7–1660(D) (2010).

The family court held the initial permanency planning hearing[3] on February 6, 2014, six months after the children entered foster care. At that time, Briggs had obtained stable employment and housing, completed parenting classes, and completed a psychological evaluation. She had been assessed by a counselor at a drug and alcohol treatment center, who wrote in a report that Briggs was "receptive to feedback" and "a pleasure to work with." Briggs had also begun individual counseling. The family court amended Briggs's placement plan to add several additional requirements, including that "Briggs successfully complete family counseling at the Nurturing Center[4] or a similar type facility." The court determined the permanent plan for the children would be reunification and ordered a reevaluation in three to six months.

In April 2014, Briggs completed additional parenting classes and individual counseling. In a letter, Briggs's counselor wrote Briggs's mood had improved and "[h]er insight and judgment appear[ed] to be appropriate."

On April 15, 2014, Briggs began therapy with the Nurturing Center. Briggs had perfect attendance and attended for five hours each day, although she was often tardy. After participating for one month, Briggs was discharged. At the second permanency planning hearing, Jameka Hemming, an employee of the Nurturing Center, explained the reason for Briggs's discharge. She stated the Nurturing Center temporarily closed on May 9 due to a lapse in its liability insurance, and when it reopened on May 15, its clients—including Briggs—were required to sign new consent forms. According to Hemming:

> Ms. Briggs said she wasn't signing anything unless her lawyer looked at it because we were telling lies on her. We tried to address what lies [she was] talking about. She didn't want to talk about it. But she then went to . . . talk

---

3. A permanency planning hearing must be held no later than one year after the children are first placed in foster care. S.C.Code Ann. § 63-7-1700(A) (Supp.2014).

4. Nurturing Center is a private organization whose goal is to "[p]rovide comprehensive, family-focused, behavioral health services to prevent and treat child abuse and neglect." The Nurturing Center Mission, Goals, and Beliefs, The Nurturing Ctr., http://www.thenurturingcenter. org/index.php/about-us (last visited July 24, 2015).

to my supervisor and another staff [member]. I stayed in the classroom, so I don't know the conversation. She came back and got her stuff and then she left.

. . . .

... After Ms. Briggs left, she did call back. And talked to my supervisor and another director. She then called me. She wanted to come back to the center. We did do a staffing and the clinical staff found that she wasn't appropriate for our services at that time, just due to her aggressive behavior [and] not being able to be redirected and just not being receptive to any changes[ ] to her parenting or trying to improve her parenting.

Hemming justified Briggs's discharge by explaining Briggs was difficult to deal with even before the incident involving the consent form and Briggs "didn't really like to be redirected or told what to do." She stated Briggs had previously been discharged from the Nurturing Center in October 2013—before the court adopted her placement plan—after getting into a fight with another parent. Hemming stated her comments in group sessions were off-topic and she became aggressive when redirected. Hemming explained, "She would get an attitude. She would be disruptive in group with her cell phone, sucking her teeth, a lot of rolling her eyes. There were instances when we got into altercations in group." Hemming elaborated: "I ... got into an altercation with her [during] a group [session]. She stood up, she started to approach me. A lot of yelling, a lot of pointing, a lot of times she would always say, 'I'm grown. I'm grown.' "

Hemming also testified Briggs was "extremely preoccupied" with her second child's foster parent and threatened to sue DSS because he was often dressed in old clothes and shoes that had holes in them even though Briggs sent him clothes and shoes. Hemming stated Briggs ranted about that during group sessions, which Hemming believed was inappropriate. Hemming recounted an incident when Briggs gave one of her children gum during nap time. When staff at the Nurturing Center approached Briggs about it, Briggs's response was "it's sugar free." Hemming also observed Briggs asking her children if they were being abused or neglected in their foster home.

Even though Hemming believed Briggs was difficult to deal with, she believed Briggs was appropriate with her children. Hemming acknowledged Briggs's oldest child was hyper but stated his behavior had improved. She also stated Briggs began attending on time "towards the end" and had not had any physical altercations since becoming Hemming's client.

In the same timeframe Briggs was discharged from the Nurturing Center, she was making good progress in other areas. Three days prior to being discharged from the Nurturing Center—May 12, 2014—Briggs began family therapy with her oldest child through the Department of Mental Health. In a July 25, 2014 letter, a counselor from the Department of Mental Health wrote that Briggs consistently kept weekly appointments and followed treatment recommendations. The counselor wrote Briggs "show[ed] insight into [her oldest child's] behaviors, show[ed] concern about [his] recent exhibiting of sexually explicit behavior, and ha[d] been nurturing towards [him]." He stated Briggs's oldest child could "successfully be returned home" if Briggs obtained "external support, continued family therapy, and continued practic[ing] parenting techniques learned in therapy."

Briggs gave birth to her fourth child in July 2014, and the family court issued an ex parte order placing the child in emergency protective custody. At the probable cause hearing pursuant to section 63–7–710 of the South Carolina Code (2010), the family court determined probable cause existed for the youngest child to remain in foster care based on Briggs's abuse of the older children and the fact Briggs had not completed the court-ordered treatment services.

On July 28, 2014, the family court held the second permanency planning hearing for Briggs's older children. At the hearing, DSS sought a permanent plan for the children of TPR and adoption concurrent with "custody with a fit and willing relative" ("relative custody"). DSS also sought to be relieved of offering further services to Briggs. DSS offered the testimony of Jameka Hemming of the Nurturing Center, which is summarized above. The DSS caseworker testified Briggs completed all the services she was ordered to complete but asserted Briggs did not demonstrate behavioral changes. In reaching this conclusion, she relied primarily on reports

from the Nurturing Center. The caseworker observed a visit between Briggs and two of her children, and she believed Briggs was appropriate during the visit. She acknowledged Briggs's oldest child had discipline problems, had been in multiple placements, and was in a therapeutic placement at the time of the permanency planning hearing.

Briggs testified in her defense. Briggs submitted the report from the drug and alcohol treatment center and the letters from the counselor she saw through April 2014 and the counselor she saw at the Department of Mental Health. However, she did not call any of the counselors to testify at the hearing.

The guardian ad litem also testified. He stated he did not believe Briggs demonstrated a behavior change because she argued with staff and other people and did not control her emotions. The guardian ad litem recommended TPR and adoption concurrent with relative custody, but he stated he would not oppose DSS if it wanted to offer Briggs additional services.

At the conclusion of the second permanency planning hearing, DSS noted it had a pending merits hearing for Briggs's youngest child's case that was not before the court and stated the evidence it would offer in support of the removal would be the same evidence the court already heard. Briggs contested the removal but conceded the underlying facts for that case were the same and "it wouldn't make sense to have another" hearing.

The family court issued two orders. Regarding Briggs's three older children, the court found Briggs had not remedied the conditions that caused the removal and changed the permanent plan for the children to relative custody concurrent with TPR and adoption. Additionally, the court found it would be in the children's best interests for DSS to forego reasonable efforts at reunification.

Regarding Briggs's youngest child, the family court first found a preponderance of the evidence showed she was an abused or neglected child pursuant to subsection 63-7-20(4)(f) of the South Carolina Code (2010) and returning her to the home would place her at an unreasonable risk of harm or neglect. The court determined DSS could forego reasonable

efforts to reunify Briggs with her youngest child pursuant to subsection 63–7–1640(C)(8) of the South Carolina Code (Supp. 2014) and ordered the child's permanent plan to be relative custody concurrent with TPR and adoption.

## II. Standard of Review

■ On appeal from the family court, this court reviews factual and legal issues de novo. *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011); *see also Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011).

## III. Forego Reasonable Efforts at Reunification

■ Briggs argues the family court erred in allowing DSS to forego reasonable efforts at reunification. Because we find the family court did not make adequate findings supporting its decision, we reverse and remand.

"It is the policy of this State to reunite the child with his family in a timely manner...." S.C.Code Ann. § 63–1–20(D) (2010). The children's code "shall be liberally construed to the end that families whose unity or well-being is threatened shall be assisted and protected, and restored if possible as secure units." S.C.Code Ann. § 63–1–30 (2010). At the initial permanency planning hearing, DSS recommended—and the family court approved—a permanent plan of reunification. Subsection 63–7–1640(F) of the South Carolina Code (Supp. 2014) sets forth the standard family courts must follow when determining whether to allow DSS to forego reasonable efforts at reunification. The subsection provides that, in making such a determination, "the court must consider whether ... continuation of reasonable efforts to preserve or reunify the family is in the best interests of the child." Before the court may authorize DSS to forego reunification, "the court must make specific written findings in support of its conclusion that one or more of the conditions set forth in subsection [63–7–1640](C)(1) through (8) [ (Supp. 2014) ] are shown to exist, and why continuation of reasonable efforts is not in the best interest of the child." § 63–7–1640(F).

As to the three older children, the family court stated, "Briggs has not remedied the conditions that caused the removal," and "[i]t is in the minors' best interests to terminate

reasonable efforts to reunite the minors" with Briggs. However, the court did not make the findings required by section 63–7–1640. In particular, the court made no finding regarding the conditions listed in subsection 63–7–1640(C) or as to "why continuation of reasonable efforts [was] not in the best interest of the child[ren]." § 63–7–1640(F). The family court determined only, "DSS is no longer obligated to provide or arrange treatment services to . . . Briggs. The permanent plan for the minors at this time is no longer reunification. . . ." The family court did find subsection 63–7–1640(C)(8) applied to Briggs's youngest child's case, but it did not make any specific findings to support the conclusion. Subsection 63–7–1640(C)(8) requires the family court to find "other circumstances exist" that make continuation of reasonable efforts at reunification inconsistent with the child's permanent plan. However, the family court did not make any finding as to what the "other circumstances" were.

Accordingly, we reverse and remand for a new permanency planning hearing and for the family court to make specific written findings to support its decision as required by subsection 63–7–1640(F). On remand, the family court should also consider the continuation of treatment services for Briggs.

## IV. Permanent Plan

■ Briggs also contends the family court erred in finding the permanent plan should be relative custody concurrent with TPR and adoption. Based on the specific facts presented, we remand this issue for the family court to consider whether the permanent plan should be an extension for reunification.

Section 63–7–1700 of the South Carolina Code (Supp.2014) sets forth several options for a family court at a permanency planning hearing. The family court must return the child to the parent's home if it determines "the child may be safely maintained in the home in that the parent has remedied the conditions that caused the removal." § 63–7–1700(D). The family court may order an extension for reunification if the court determines the child cannot be returned home at the time of the hearing "but that the child may be returned to the parent within a specified reasonable time." § 63–7–1700(F). To grant an extension, the family court must make specific

findings as set forth in subsection 63–7–1700(F). The family court may award custody or legal guardianship to a suitable, fit, and willing relative or nonrelative "[i]f after assessing the viability of adoption, [DSS] demonstrates that [TPR] is not in the child's best interests." § 63–7–1700(G). The family court may approve a plan that is not reunification, relative custody, or TPR if it finds compelling reasons to select another plan and that the plan is in the child's best interests. § 63–7–1700(C). Finally, the family court must order DSS to file a petition for TPR if the child cannot be returned home and the court determines subsections (C), (F), or (G) do not apply. § 63–7–1700(E).

Here, the family court properly determined the children could not be safely returned home at the time of the permanency planning hearing. Although Briggs was making progress in the placement plan, she had not completed important components of the plan. Having determined the children could not be returned home, the family court next determined the permanent plan would be relative custody concurrent with TPR and adoption. Based on the order, it appears the family court based its decision primarily on the fact Briggs was discharged from the Nurturing Center, which DSS submitted as proof that Briggs was not making the required behavior changes. However, we find Briggs's discharge does not constitute sufficient proof that she was not making behavior changes. Hemming, who testified about Briggs's discharge, was not present for Briggs's conversation with her supervisor and had no personal knowledge of the discussion that took place or Briggs's reasons for leaving the Nurturing Center that day. When asked why Briggs was discharged, Hemming first stated the Nurturing Center temporarily closed based on a change in insurance, and when it reopened, Briggs refused to sign the new consent forms without first seeking her attorney's advice. Briggs's request to review the forms with an attorney was reasonable. By not signing them, however, she set off a chain of events that ultimately resulted in her discharge from the Nurturing Center. We find the evidence presented regarding Briggs's discharge from the Nurturing Center does not constitute sufficient proof that Briggs was not making the required behavior changes.

Additionally, we are impressed by the positive reports Briggs submitted from other service providers, including the Department of Mental Health, where Briggs attended ongoing family therapy with her oldest child. According to the letter from the Department of Mental Health—which was written after Briggs's discharge from the Nurturing Center and entered into the record without objection—Briggs showed insight into her oldest child's behavior and "expressed a desire to continue therapy." In the letter, the counselor recommended continued family therapy and stated Briggs's oldest child could be "successfully returned home" if Briggs obtained "external support, continued family therapy, and continued practic[ing] parenting techniques learned in therapy." Although Briggs successfully completed several aspects of her treatment plan and was continuing family counseling through the Department of Mental Health, the order does not indicate the family court considered this and other positive reports or Briggs's ongoing therapy when determining the permanent plan. Because the children had been in foster care for less than one year at the time of the permanency planning hearing and Briggs was regularly attending counseling designed to help her remedy the conditions causing removal, an extension for reunification would have been a viable option for the permanent plan. Accordingly, on remand, the family court shall consider whether the permanent plan should be an extension for reunification, as set forth in subsection 63–7–1700(F).

## V. Removal

█ Briggs argues the family court erred in removing her youngest child from the home based on its previous finding she abused or neglected the three older children. We disagree.

The removal statute provides:

The [family] court shall not order that a child be removed from the custody of the parent or guardian unless the court finds that the allegations of the [removal] petition are supported by a preponderance of evidence including a finding that the child is an abused or neglected child as defined in Section 63–7–20 and that retention of the child in or

return of the child to the home would place the child at unreasonable risk of harm. . . .

S.C.Code Ann. § 63–7–1660(E) (2010).

"Child abuse or neglect" or "harm" occurs when the parent, guardian, or other person responsible for the child's welfare:

(a) inflicts or allows to be inflicted upon the child physical or mental injury . . .; [or]

. . . .

(f) has committed abuse or neglect as described in subsections (a) through (e) such that a child who subsequently becomes part of the person's household is at substantial risk of one of those forms of abuse or neglect.

S.C.Code Ann. § 63–7–20(4) (2010).

In the merits order for the removal of Briggs's three older children, the family court found by a preponderance of the evidence that Briggs physically abused them, as defined by section 63–7–20(4)(a). Briggs's youngest child was born after the family court made that determination. Thus, a preponderance of the evidence supports a finding of abuse under 63–7–20(4)(f) and qualifies the youngest child as an abused child. A preponderance of the evidence also supports the family court's determination that returning the children home at that time would place them at an unreasonable risk of harm. Thus, the family court did not err in removing Briggs's youngest child.

### VI. Conclusion

Based on the foregoing, we affirm the family court's removal of Briggs's youngest child. We reverse the family court's permanent plan and its decision to allow DSS to forego reasonable efforts at reunification, and remand for a new permanency planning hearing consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**